NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2503-18T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHRISTOPHER RADEL a/k/a
CHRISTOPH R. RADEL,
CHRISTPOH R. RADEL, and
CHRISTOHE R. RADEL,

    Defendant-Appellant.

_____

<div style="border:1px solid;">

**APPROVED FOR PUBLICATION**

**October 20, 2020**

**APPELLATE DIVISION**

</div>

> Argued September 15, 2020 – Decided October 20, 2020
>
> Before Judges Fisher, Moynihan and Gummer.
>
> On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 16-08-0697.
>
> Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).
>
> Deborah Bartolomey, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Deborah Bartolomey, of counsel and on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

After being indicted and charged with numerous weapons and drug offenses, defendant moved in the trial court for the suppression of evidence seized from his home. The evidence – guns, ammunition, drugs, and drug paraphernalia – was seized pursuant to a search warrant supported by information police had obtained during a warrantless entry into defendant's home. The State persuaded the trial judge that the warrantless entry did not run afoul of the Fourth Amendment because the police were justified in conducting a protective sweep. Because the evidence and the judge's findings do not support that conclusion, we vacate the order denying suppression and remand for further proceedings. In light of this disposition, we find it unnecessary at this time to consider the other issues defendant raised in this appeal.

The record reveals that after the judge's denial of defendant's suppression motion, defendant reached a plea agreement with the State and entered a conditional guilty plea to one count of second-degree being a certain person not permitted to possess weapons, N.J.S.A. 2C:39-7(b)(1), and one count of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1). As part of the plea agreement, the State dismissed the other eighty-six counts of the indictment. Defendant was later sentenced, within the plea agreement's

parameters, to a ten-year prison term, subject to a five-year period of parole ineligibility, on the certain-persons conviction and a fifteen-year prison term, subject to a seven-and-one-half-year period of parole ineligibility, on the unlawful-possession-of-a-weapon conviction; both terms were ordered to run consecutively.

Defendant appeals, arguing:

> (1) the warrantless entry and purported protective sweep of his home could not be justified because, among other things, he was arrested and handcuffed outside the home before the sweep occurred;

> (2) those counts charging unlawful possession of a firearm under N.J.S.A. 2C:39-5(b)(1), were barred by N.J.S.A. 2C:39-6(e), which declares that nothing in subsection (b) of N.J.S.A. 2C:39-5 "shall be construed to prevent a person keeping or carrying about his . . . residence . . . any firearm";

> (3) those counts charging possession of hollow nose bullets, N.J.S.A. 2C:39-3(f)(1), were barred by N.J.S.A. 2C:39-3(g)(2)(a), for reasons similar to those raised in his second point;

> (4) the charges based on defendant's possession of marijuana or drug paraphernalia should have been dismissed because, in defendant's words, "the State failed to present clearly exculpatory evidence to the grand jury demonstrating that defendant could lawfully possess marijuana for medical reasons"; and

> (5) the sentence imposed was shocking to the judicial conscience and otherwise improperly imposed.

A-2503-18T3

We agree with defendant that the police were not entitled to conduct a protective sweep under the circumstances. For that reason, we vacate the order denying the suppression motion and remand for further proceedings without reaching or deciding the other four issues.[1]

Three police officers and defendant testified at the suppression hearing. The State's evidence revealed that police interest in defendant started with an assistant prosecutor's January 7, 2016 call to local police about an October 27, 2015 order, which apparently sprang from defendant's March 2015 conviction for unlawful possession of a weapon. The order directed "members of Little Falls Police Department [to] respond to the [d]efendant's home, located at 103 Browertown Road [, Little Falls] . . . for the limited purpose of retrieving from said home any and all firearms, including one Beretta [handgun]." One of the officers testified that after the phone call from the prosecutor's office he did some research and learned defendant was the target of two outstanding municipal arrest warrants. He also learned that defendant lived at 81 Browertown Road, not 103 Browertown Road where his parents lived. The

---

[1] Because we do not consider them at this time, defendant may pursue those other four issues in any later appeal, if necessary.

officer called and briefly spoke to defendant's mother, who, the officer asserted, wasn't helpful in assisting his attempts to get in touch with defendant.

The police assembled a team of six officers for the purpose of going to defendant's neighborhood and arresting him on the outstanding municipal arrest warrants. 81 Browertown and 103 Browertown are on the same side of the street and separated by a driveway that runs off Browertown and into a Passaic Valley High School parking lot. The officers were stationed around the premises; some watched the backs of the homes, and others sat in the driveway to the high school between 81 and 103 Browertown. Before long, one officer noticed a figure in blue in the backyard of 81 Browertown entering the rear of that home; that officer also heard a "loud bang." Within a few minutes, other officers saw a person, who matched their photos of defendant, wearing a blue jacket as he exited the front door of 81 Browertown carrying a laundry basket. As defendant placed the laundry basket in the backseat of a vehicle parked in the driveway, an officer – in his words – was "on" him, seizing defendant and placing him face down as he applied handcuffs. Defendant did not resist. Once defendant was in custody, the police concluded a protective sweep of 81 Browertown was necessary out of a concern there might be others inside, along with the handgun they had come to retrieve.

After entering the dwelling at 81 Browertown, police observed in plain sight a black handgun in a glass cabinet, a ballistics vest, and drug paraphernalia. No other person was inside. Some officers then left to seek out a search warrant while others remained behind to secure the premises until the warrant was obtained. A judge issued a search warrant and the subsequent search led to the seizure of weapons and other evidence that were the subject of defendant's unsuccessful suppression motion. The linchpin of the judge's denial of the motion was his finding that the officers engaged in a legitimate protective sweep of 81 Browertown.

In considering defendant's argument about the challenged protective sweep, we start with broad principles. The Fourth Amendment protects individuals from unreasonable searches and seizures, and "the chief evil against which the wording of the Fourth Amendment is directed" is an unwarranted physical intrusion into the home. United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972). So, the officers' entry into 81 Browertown after defendant's arrest outside was presumptively unlawful absent the State's demonstration that the entry fell into one of the specific exceptions acknowledged by the Supreme Court of the United States. State v. Davila, 203 N.J. 97, 111-12 (2010). The only exception argued by the State was based on the protective-sweep doctrine.

6

In Maryland v. Buie, 494 U.S. 325, 327 (1990), the Court approved the protective-sweep doctrine while also recognizing that to pass constitutional muster the sweep must be

> a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.

Despite Buie's declaration that the search of the premises must be "incident to an arrest," ibid., our Supreme Court has recognized that this doctrine has been "extended," State v. Bryant, 227 N.J. 60, 70 (2016), and the warrantless sweep is permitted, when:

> (1) law enforcement officers are lawfully within the private premises for a legitimate purpose, which may include consent to enter; and (2) the officers on the scene have a reasonable [and] articulable suspicion that the area to be swept harbors an individual posing a danger.
>
> [Davila, 203 N.J. at 125.]

Even though a protective sweep does not have to be "incident to an arrest," Buie and Davila presuppose that law enforcement officers who believe themselves or others in potential danger would actually be in the premises or location to be swept. In both cases, officers were properly inside the defendant's home either

to execute an arrest warrant or by consent, thus presenting the heightened concern for their safety that the protective-sweep doctrine requires.

This case differs. No one disputes that defendant was <u>outside</u> his home, under arrest, and in handcuffs <u>before</u> police made the decision to enter his home, ostensibly for their protection. Despite this distinguishing fact, the judge found that <u>Davila</u>'s first prong "can be extended to the circumstances of this case" and he then justified that extension by reference to facts he found supportive of the second prong. We reject the judge's legal analysis.

The first prong requires that the officers have a legitimate purpose for being within the private area to be swept. The officers were in the vicinity to either obtain the handgun described in the October 27 forfeiture order or to execute the municipal warrants calling for defendant's arrest. The October 27 order only directed them to 103 Browertown, not 81 Browertown; it did not explicitly authorize a search of the former, let alone the latter. And, the municipal warrants only provided authority to arrest defendant. Once the arrest was accomplished, the arrest warrants were fulfilled, and the officers had no further legitimate purpose for remaining on the property. <u>See</u> <u>State v. Lane</u>, 393 N.J. Super. 132, 154-55, 157-58 (App. Div. 2007). We, thus, reject the judge's legal conclusion that the first prong of the <u>Davila</u> test was met.

Even assuming the first prong was satisfied, we conclude that the circumstances offered on the second prong were insufficient to support a permissible protective sweep. In finding that the State sufficiently demonstrated the officers had a reasonable and articulable suspicion that the place to be swept harbored a danger, the judge relied on:

- the forfeiture order;

- one officer's fleeting observation that someone dressed in blue in the backyard entered the home from the rear a few minutes before defendant, also dressed in blue, exited from the front;

- that same officer heard a "loud bang";

- two cars were in the driveway; and

- what the judge referred to as defendant's "contradictory answers to the police."

We conclude that, whether considered individually or collectively, these circumstances could not support a reasonable and articulable suspicion that both a weapon and at least one other person were inside 81 Browertown and posed a threat to the officers or others.

The forfeiture order. We do not know – because the State failed to show at the suppression hearing – what led to the issuance of the October 27 forfeiture order. Even so, the order suggested only that a handgun could be found at 103

9

Browertown; it was silent about 81 Browertown. And, whatever it suggested about 103 Browertown was nearly three-month-old information when the officers arrived to arrest defendant. So, we not only reject the leap suggested by the State that this order authorized entry into 103 Browertown – it says no such thing[2] – but we reject as well the contention that this order somehow supports a belief that the handgun could be found inside 81 Browertown three months later.

The person in the backyard. One of the officers stationed so he could watch the rear of 81 Browertown testified that he observed

> a person walking in the rear yard of 81 Browertown. The individual was wearing something blue. And – and, then, the image was gone. . . . [T]he image . . . [e]ntered the rear of 81 Browertown.

---

[2] When questioned by the judge about the October 27 order's significance, the assistant prosecutor conceded that it could not pass for a search warrant:

> THE COURT: . . . But, listen to me. I'm going to tell you what really bothers me here, is . . . the staleness of [the October 27 order] . . . .
>
> ASSISTANT PROSECUTOR: Judge, there's no staleness. This is not a search warrant.
>
> [Emphasis added.]

"[P]retty quick[ly]" after, the officer who made this observation "became aware . . . over the radio" "that an individual had exited the front of the residence."

This testimony at best reveals only that one officer saw a person in blue in the backyard[3] and that this person in blue entered the home a few minutes before another officer saw a person in blue exit the front of the home. This suggests only one reasonable conclusion: the officer in the front of 81 Browertown saw the same person that the other officer saw in the back of 81 Browertown: defendant. Nothing about this reasonably suggests that the person seen in the backyard wasn't the person who came out the front door.[4]

The loud bang. The officer who observed the person in blue in the back of 81 Browertown also testified that after that person entered the home he heard "a very loud bang." When asked to describe the sound, he said that "if [he] had to characterize it, [it] was very metallic and very heavy – very, like a clanking almost, but a very loud, very intense sound[;] [i]t wasn't high-pitched, but it was metallic." No one else professed to have heard it. Neither at the scene nor from

---

[3] The officer testified that he had asked the other officers near him whether they saw the individual, but he never said whether anyone confirmed that they did.

[4] That officer merely testified he "wasn't sure if . . . the individual that I had seen towards the rear of the property was actually the defendant, or not. All I really saw was somebody wearing blue. I couldn't identify that person's face or really make any other descriptive observations of them."

A-2503-18T3

the witness stand did this officer state that the loud bang sounded like a gunshot or that he told the other officers prior to the protective sweep that it sounded like a gunshot.

Interestingly, the judge found this officer credible because the officer did not exaggerate by asserting it was a gunshot he heard. Nevertheless, in his findings, the judge gave this "loud bang" greater weight than police seemed to have given it at the time. Despite the fact that this officer, who was a Marine veteran, a firearm instructor, and at the time an eleven-year veteran on the police force, could not say that the bang was a gunshot, the judge found that the sound "could have been, maybe, a gunshot." Not one of the State's witnesses testified they either heard a gunshot or thought the sound might have been a gunshot.

The cars in the driveway. In forming an opinion that there could have been another person inside 81 Browertown at the time defendant was under arrest outside, police relied in part on the presence of "multiple vehicles" in the driveway but were imprecise as to what the State now claims is a relevant circumstance. One officer testified on direct that there were "multiple" vehicles in the driveway, but he said something else once subjected to cross-examination:

> Q. – in terms of the multiple vehicles that – were they all on the driveway, or were they close to the residence? Where were the location of all of these vehicles you mentioned?

A-2503-18T3

A. I would say they were both in the driveway.

Q. Both?  Was there only two?

A. That I recall, there was at least two, yes.

Q. Okay.  Was there more –

A.  At least.

Q. – do you know – was there more than two?

A. I don't recall if there was more than two.  But, I knew there were multiple vehicles in the driveway.

THE COURT:  Well, when you – but, when you say multiple, you mean two?

THE WITNESS:  Well, yes; correct.  Two.

THE COURT:  Okay.

THE WITNESS:  That I can recall.

Although in this way the officer tried to suggest the presence of more than two cars, he ultimately could state only that he was sure there were two and that is what the judge found.

Defendant's "contradictory answers" to police.  In seeking to justify the intrusion into defendant's home for the purpose of the challenged protective sweep, the State did not argue that statements defendant had given to police before the sweep were either contradictory or a basis for entry into the home.

A-2503-18T3

The only officer who testified about having a conversation with defendant first stated that he had not asked defendant for consent to search the home because he believed defendant was intoxicated and unable to give lawful consent. The officer testified that defendant had asserted, when asked, that he had turned in the gun referred to in the October 27 order. That assertion – if true – was not contradictory of anything else defendant was claimed to have said. When asked about their discussion immediately after defendant's arrest, the officer provided the following testimony:

> A. I do believe I did mention the – the weapons in question on the order. Because he did tell me that he had turned some of those gun – or turned that gun in. Or sold one of them – those guns. So, out – out of the guns that I had mentioned to him, he had – did respond to me.
>
> Q. In terms of his response, what did – what was – did he indicate which firearms, if any, he – he did surrender before your –
>
> A. I don't recall.
>
> Q. – appearance.
>
> A. I don't recall which weapon he said he surrendered.

The October 27 order referred to two weapons. The order's first paragraph revoked defendant's firearm purchaser identification card that had permitted the purchase of two handguns: a .357 Smith & Wesson and a 9mm Beretta. The

14

second paragraph authorized police to go to 103 Browertown to retrieve the Beretta. No other weapon is specifically mentioned in the order, nor does anything about the order suggest any unaccounted-for weapon but the Beretta. So, we interpret the officer's quoted testimony as suggesting that defendant said he surrendered one and sold the other: an assertion that is not, on its face, contradictory.

More importantly, the judge made no specific finding as to how the statements attributed to defendant were contradictory. The judge only generally concluded that what the officer attributed to defendant was contradictory. It may be that what defendant then said was contradicted by what the police later learned when executing the search warrant, but what was later learned is irrelevant to what the officers may have objectively believed when deciding to sweep the premises. See Florida v. Harris, 568 U.S. 237, 249 (2013). An intrusion is not made legal and an officer's unexplained hunches do not ripen into a reasonable and articulable suspicion "by what it turns up"; instead, to borrow Justice Jackson's words, the intrusion "is good or bad when it starts and does not change character from its success." United States v. Di Re, 332 U.S. 581, 595 (1948); see also State v. Howery, 80 N.J. 563, 584 n.5 (1979).

A-2503-18T3

From these five circumstances, the judge concluded that the officers had a reasonable and articulable suspicion that both a weapon and other individuals were inside 81 Browertown and posed a danger to them or others.

We are mindful that judge-made findings are generally entitled to appellate deference when supported by "sufficient credible evidence in the record." State v. Locurto, 157 N.J. 463, 471 (1999). Deference is given to those findings that "are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964); see also State v. Elders, 192 N.J. 224, 244 (2007). This deference, however, does not extend to legal conclusions drawn from the found facts. In Interest of J.A., 233 N.J. 432, 445 (2018). Those conclusions are reviewed de novo. Ibid.

To summarize, the judge's determination that the officers had a reasonable and articulable suspicion of a danger was based on the five circumstances we have discussed. Only two of them arguably suggest the presence of a weapon inside 81 Browertown, and the other three only arguably suggest the presence of another person inside.

The two circumstances that suggested the presence of a weapon inside 81 Browertown were, according to the judge's oral decision, the October 27 order

16

and the "loud bang." The order, if accepted at face value, stated only that as of October 27 a gun could be found at 103 Browertown. The conclusion the judge seems to have implicitly drawn is that this would also mean that three months later the same gun would <u>not</u> be there but at the nearby 81 Browertown; that conclusion is not entitled to deference because it is entirely speculative. The only other fact offered in support of the officers' belief that a gun was located within 81 Browertown was the "loud bang." But the only officer who heard the "loud bang" did not form or express a belief as to what he thought made that sound. He didn't say it was a gunshot. And he didn't say it sounded like a gun dropped on cement.[5] So, while we will defer to the judge's finding that such a "loud bang" was heard by an officer, the speculative conclusion the judge drew from that fact – "it could have been, maybe, a gunshot" – is not entitled to deference because only the judge – not the officers – drew that conclusion.

The three circumstances that the judge relied on in concluding that the officers had a reasonable and articulable suspicion that others were inside 81

---

[5] Considering that the later search uncovered, among other things, two handguns in a backpack in the detached garage likely suggests defendant had walked out the back of the house and dropped the backpack in the garage, arguably making the sound that the officer heard when the backpack hit the garage floor. But this can only be surmised through hindsight; it was not something known or knowable to the officers when they decided to conduct the protective sweep.

Browertown – even assuming police were entitled to believe a gun was also within the dwelling – are also speculative. An extra car in the driveway suggests little. And the judge made no finding as to whether the officers could reasonably conclude that the person in blue fleetingly seen entering the back of 81 Browertown was not defendant, who a few minutes later exited the front of 81 Browertown wearing a blue jacket. The judge lastly adds to his analysis defendant's "contradictory answers to the police" about the gun, but the statements were not contradictory on their face and the police could not have known defendant was untruthful about the presence of a weapon on the property until they conducted the protective sweep. The statements attributed to defendant did not and could not support a reasonable decision to conduct a protective sweep.

Thus, in giving deference to those findings supported by the evidence found credible, we find no support for the judge's conclusion that the police had a reasonable and articulable suspicion that there were other persons inside the home or that they posed a risk to the police or others.

* * *

A-2503-18T3

For all these reasons, we conclude that the circumstances presented here do not support either prong of <u>Davila</u>'s protective-sweep test. We vacate the order denying suppression and remand for further consideration.

Specifically, we remand for the trial judge to first determine whether the facts contained in the warrant affidavit were sufficient to support the issuance of a search warrant once the information obtained from the impermissible protective sweep is removed from consideration. We direct that, within forty-five days, the judge render his determination on this question, allowing – if the judge deems it appropriate – additional submissions from the parties. We retain jurisdiction until the judge's final disposition of the suppression motion but only if the motion is denied. If it is denied, defendant may file a timely amended notice of appeal and we will enter a scheduling order for supplemental briefing. If, on remand, the judge grants the suppression motion, then: the judge shall vacate the judgment of conviction; our retention of jurisdiction will automatically terminate; and the matter shall proceed in the trial court to a final disposition.

Vacated and remanded for further proceedings in conformity with this opinion. We retain jurisdiction but only to the extent expressly described.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19